**PLANNED PARENTHOOD OF METRO-POLITAN WASHINGTON, D.C., INC., et al., Plaintiffs,**

**v.**

**Constance HORNER, Director, United States Office of Personnel Management, Defendant.**

**Civ. A. No. 88–1751.**

United States District Court, District of Columbia.

July 20, 1988.

Walter B. Slocombe, Geoffrey J. Vitt, Eileen M. Mallon, Caplin & Drysdale, Washington, D.C., for plaintiffs.

Asst. U.S. Atty. Mark E. Nagle, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This case features yet another imbroglio arising out of the administration of the Combined Federal Campaign (CFC or Campaign).[1] The origin of this latest legal altercation is the issuance of a regulation by the Office of Personnel Management (OPM) that would bar an organization granted national eligibility and any one of its affiliates from dual listing in CFC brochures as possible recipients of Campaign funds. Because the Court concludes, for the reasons articulated below, that this regulation is inconsistent with a statute passed by Congress, a preliminary injunction will be entered barring defendant from implementing it.

### I. Background

Established by President John F. Kennedy in 1961, the CFC is the sole means by which government employees, both civilian and military, may be solicited for charitable donations while at their place of work. Federal workers may donate to any organization listed as eligible to participate in the Campaign and, upon request, contributions are either made directly to the Campaign or withheld from their paychecks. Due to the generosity of government employees, the CFC has now grown to the point where more than 7000 organizations receive approximately $150 million in contributions.

Administration of the CFC proceeds on a bifurcated basis. Ultimate responsibility is vested in the Director of OPM, who assures that the objectives of the Campaign are achieved and acts as final arbiter of any disputes that arise. The bulk of CFC activity, however, takes place at the local level. The Director has established over 500 local CFCs, each of which is supervised by a Local Federal Coordinating Committee (LFCC).[2] The LFCCs, in turn, select Principal Combined Fund Organizations (PCFOs) to handle the daily operational tasks of each local Campaign, such as preparing brochures and collecting contributions. Participation in the CFC is similarly divided, with differing standards for national and local eligibility. At the national level, the Director selects a number of organizations that are eligible to participate in each of the local CFCs conducted throughout the country. To obtain local eligibility, an organization must apply to, and be approved by, the LFCC for the particular local Campaign in which it seeks to participate.

Plaintiff Planned Parenthood Federation of America, Inc. (PPFA) is a nonprofit, private organization that provides family planning services on a local, national and international scale.[3] Like many other charitable federations, PPFA is linked to a number of local, independent affiliates. One such local affiliate of PPFA is plaintiff Planned Parenthood of Metropolitan Wash-

1. *See Planned Parenthood Federation of America v. Horner,* 636 F.Supp. 762 (D.D.C.1986), *appeal vacated as moot,* 795 F.2d 215 (D.C.Cir.1986), *dismissed as moot,* (D.D.C. February 3, 1988); *Planned Parenthood of Metropolitan Washington, D.C., Inc.,* —— F.Supp. ——, No. 86–2584 (D.D.C. September 19, 1986); *NAACP v. Devine,* 560 F.Supp. 667 (D.D.C.1983); *NAACP v. Devine,* 567 F.Supp. 401 (D.D.C.1983), *aff'd,* 727 F.2d 1247 (D.C.Cir.1984), *rev'd and remanded,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), *dismissed as moot,* (D.D.C. February 3, 1988).

2. The LFCCs are composed of federal interagency organizations, agency heads and employee unions and groups.

3. PPFA carries out its mission through research, information distribution and technical and financial support. Complaint ¶ 7.

ington, D.C., Inc. (PPMW). Both PPFA and PPMW have taken part in the Campaign during the last several years, PPFA as a national organization and PPMW locally within the National Capital Area CFC.

As noted above, this case concerns a regulation promulgated by OPM in May 1988 that would prohibit a national organization (such as PPFA) and one of its affiliates (such as PPMW) from simultaneously appearing on the list of eligible organizations distributed to federal employees in their local CFCs (hereinafter referred to as the "dual listing regulation"). This regulation was not, however, the first time that OPM has attempted to prohibit dual listing and, because the agency's prior efforts in this regard directly relate to the issues presented in the instant lawsuit, they will be briefly recounted.

PPMW first applied for admission to the National Capital Area CFC in 1985. Declaring that an OPM "rule" prohibited listing an affiliate and its national organization, an agency official objected to PPMW's application. The LFCC, however, rejected this objection because it found that no such rule existed and, after the Director of OPM refused to overturn that determination, PPMW participated in the 1985 Campaign. In April 1986, OPM published a dual listing prohibition among regulations that it issued to govern the 1986 CFC. On July 2, 1986, however, the President signed the Urgent Supplemental Appropriations Act of 1986, Pub.L. No. 99–349. Section 204 of that statute, known as the Hoyer Amendment, prohibited OPM from

> preparing, promulgating or implementing new regulations dealing with organization participation in the 1986 Combined Federal Campaign other than repromulgating and implementing the 1984 and 1985 Combined Federal Campaign regulations, unless such regulations provide that any charitable organization which participated in any prior campaign shall be allowed to participate in the 1986 campaign.

Based on the dual listing regulation, PPMW was excluded from the 1986 Campaign, and it brought suit to challenge OPM's actions. *See Planned Parenthood of Metropolitan Washington, D.C., Inc. v. Horner*, 694 F.Supp. 970 (D.D.C.1986) (*PPMW I*). Explicitly finding that the 1984 regulations contained no ban on dual listing, this Court held that OPM's 1986 dual listing proscription violated the Hoyer Amendment because it was "not simply a repromulgation or reimplementation of the 1984 regulations" and because, if implemented, it would exclude PPMW (a prior Campaign participant). *Id.* at 5. Accordingly, OPM was enjoined from enforcing the dual listing ban.

The parallels between *PPMW I* and the instant case are striking. On December 22, 1987, the President signed into law the Treasury, Postal Service and General Government Appropriations Act for 1988 (the Act).[4] In Section 618 of the Act, Congress for the first time set forth its own criteria to govern the CFC.[5] Section 618(a) states that no funds may be used in

> preparing, promulgating, or implementing any regulations relating to the Combined Federal Campaign if such regulations are not in conformance with subsection (b).

A number of provisions are then set forth in Section 618(b) relating to the CFC; two are particularly relevant for present purposes. Section 618(b)(1)(B) states:

> Any requirements for eligibility to receive contributions through the Combined Federal Campaign shall ... remain the same as the criteria in the 1984 regulations, except as otherwise provided in this section.

In addition, Section 618(b)(1)(C)(i) provides that

> any voluntary agency or federated group which was a named plaintiff as of September 1, 1987, in a case brought in the United States District Court for the District of Columbia, and designated as Civil

---

4. *See* Pub.L. No. 100–202, 101 Stat. 1329 *et seq.*

5. Because of its importance to this lawsuit, the full text of Section 618 is set forth as an Appendix to this Memorandum Opinion.

Action No. 83–0928 or 86–1367 ... shall be considered to have national eligibility.

On May 26, 1988, OPM issued final regulations to govern future administration of the Campaign. *See* 53 Fed.Reg. 19,146 *et seq.* Section 950.402(b) of those regulations contains a ban on dual listing. It states:

> No voluntary agency or federation may be listed in both the national and local lists. The listing of both a national voluntary agency and its local affiliate or other subunit is prohibited even if the local affiliate or other subunit applies separately for admission to the local campaign. The national parent agency shall determine whether it or its local affiliate or other subunit will be listed. If the national parent agency applies for the national list then it will be presumed, unless it authorizes in writing that its local affiliate be listed instead of the national parent agency, that the national parent agency has determined that its local affiliates and subunits will not be included in local CFCs. Similarly-named local agencies may be listed provided that the LFCC determines that each delivers services to distinct geographical areas.[6]

On June 27, 1988, plaintiffs filed this lawsuit contending that OPM's latest dual listing provision violates Section 618. Although PPFA and PPMW are the named plaintiffs, PPFA also brought this action on behalf of all of its local affiliates other than PPMW. Complaint ¶ 4. Concurrently with the filing of their complaint, plaintiffs moved for a preliminary injunction. Because of time deadlines imposed by the Campaign,[7] expedited briefing was ordered. Defendant Constance Horner, sued in her official capacity as OPM Director (and also

referred to as "OPM"), has filed an opposition to plaintiffs' motion, and plaintiffs have submitted a reply brief. In addition, the parties presented oral arguments at a hearing on July 15, 1988. For the reasons outlined below, the Court finds that plaintiffs are entitled to the relief that they seek.

## II. Discussion

A party seeking preliminary injunctive relief, must demonstrate: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if preliminary relief is denied; (3) that, if an injunction is granted, no injury will befall other interested parties; and (4) that the public interest favors entry of the requested relief. *See Population Institute v. McPherson*, 797 F.2d 1062, 1078 (D.C.Cir.1986) (per curiam); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 673–74 (D.C.Cir.1985) (per curiam); *Foundations on Economic Trends v. Heckler*, 756 F.2d 143, 151 (D.C.Cir. 1985); *Washington Metropolitan Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). These factors are addressed *seriatim*.

### A. Success on the Merits

■ Plaintiffs' argument on the merits is straightforward. They observe that Section 618(b)(1)(B) requires that, except as provided in Section 618, CFC eligibility criteria must remain the same as the 1984 regulations. They then point out that the 1984 CFC regulations do not contain a dual listing provision. Section 618 is violated, they conclude, because the current ban on dual listing attempts to impose an eligibility requirement not included in the 1984 regulations.[8]

---

**6.** In addition to the provision set forth above, sections 950.201(c) and 950.204(e) of the regulations also further the dual listing prohibition. For the sake of simplicity, the Court will refer to the three provisions as if they were one.

**7.** LFCC decisions on applications for eligibility are due to be made no later than July 22, 1988.

**8.** Plaintiffs also point out that Section 618(b)(1)(C)(i) mandates the national eligibility of any named plaintiff in Civil Action No. 83–

0928 or 86–1367; that PPFA was the sole plaintiff in Civil Action No. 86–1367; and that the dual listing prohibition would compel PPFA to forfeit its Congressionally-guaranteed national eligibility in order to assure participation by its local affiliates. OPM does not dispute—nor could it—that Section 618(b)(1)(C)(i) grants national eligibility to PPFA. Opposition at 10. For purposes of the following discussion, the Court will assume that the dual listing proscrip-

Defendant labels this argument "a deceptively simple syllogism," Opposition at 2, contending that plaintiffs' attack on the dual listing ban is "based on a simplistic reading of one subpart of Section 618." *Id.* at 10. Noting the principle that statutes must be interpreted as a whole and not in isolation, defendant asserts that Section 618 is ambiguous on the question of a dual listing ban. Because of this uncertainty, the Director of OPM maintains, resort to extrinsic evidence of legislative intent is permissible, and she has submitted affidavits from agency officials and others which she believes demonstrate that a prohibition on dual listing is consistent with Section 618. Having considered these opposing positions, the Court is convinced that it is OPM, and not plaintiffs, who has advanced the deceptive syllogism.

At the outset, the Court unequivocally agrees that Section 618 must be viewed in its totality for, as Justice Scalia recently observed, "statutory construction ... is a holistic endeavor." *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* —— U.S. ——, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). Resort to that cardinal principal of interpretation, however, does not aid defendant's cause.

OPM asserts that Section 618 erects "a clear line of demarcation" between national and local organizations, Opposition at 6, with differing standards of eligibility being applied by different decisionmakers. It highlights several provisions in Section 618 that advance this national/local dichotomy, *see id.* at 10–11, and argues that, because the statute is silent with respect to dual listing, an ambiguity exists that justifies the submission of extrinsic evidence regarding its meaning.

OPM's argument must be rejected. Congress spoke, sharply and distinctly, in plain and unmistakable terms, when it enacted Section 618, mandating that eligibility requirements "shall ... remain the same as the criteria in the 1984 regulations, *except as otherwise provided in this section.*" Section 618(b)(1)(B) (emphasis added). In the remainder of Section 618, Congress proceeded to set forth specific, detailed and comprehensive requirements to cover the CFC.[9] Yet nowhere in the precise terms of Section 618 did Congress legislate with respect to dual listing. Thus, according to the clear command of Section 618(b)(1)(B), the 1984 regulations—which did not prohibit dual listing—must apply.

Moreover, nothing in the provisions of Section 618 cited by defendant mandate a ban on dual listing of a national organization and one of its affiliates. Although Section 618(b)(3)(A), for example, does require that determinations of national eligibility be made by the Director of OPM and those relating to local eligibility at the local level, this change in the *process* by which the Campaign is run does not compel the *substantive* criterion that OPM urges. Equally unpersuasive are the other provisions of Section 618 relied on by defendant.[10] And, as plaintiffs point out, *see* Re-

---

tion will burden PPFA in the manner in which it alleges. *See* Complaint ¶ 38.

In Civil Action No. 86–1367, PPFA challenged regulations that set standards for the 1986 Campaign. After PPFA's suit was consolidated with a related action, *NAACP Legal Defense and Education Fund v. Horner,* 636 F.Supp. 762, No. 83–0928, this Court issued a Memorandum Opinion enjoining implementation of the regulations. *See Planned Parenthood Federation of America, Inc. v. Horner,* 636 F.Supp. 762 (D.D.C. 1986). Defendant appealed that decision, but the appeal was dismissed by the court of appeals as moot because of passage of the Hoyer Amendment. *See* 795 F.2d 215 (D.C.Cir.1986). Further proceedings took place on remand, but the case was ultimately dismissed as moot in light of passage of Section 618. *See* Order of February 3, 1988.

**9.** *See, e.g.,* Section 618(b)(4)(C) (setting forth rights of federated groups); Section 618(b)(6)(B) (designating formula for allocation of undesignated contributions).

**10.** Section 618(b)(2)(A) allows voluntary agencies and federated groups to become nationally eligible "without regard to any requirements relating to 'local presence.'" That provision *removes* an obstacle to national eligibility; it does not impose one (as does the dual listing prohibition). And Section 618(b)(3)(B)(ii) states that an organization submitting information that does not satisfy eligibility requirements "may be barred from participating in the Combined Federal Campaign on a national or local level, as the case may be"; it says nothing about dual listing, nor can any ban on dual listing be logically inferred from it.

ply Brief at 4–5, different substantive criteria have been applied in the past to determine the eligibility of national and local groups, further weakening defendant's argument that Section 618 somehow worked a complete overhaul of the CFC system.

The legislative history of Section 618 reinforces this reading of the statute's plain language. Nowhere in these materials does Congress discuss dual listing. Section 618 is, however, mentioned in two places by Congress, and these references shed additional light on its meaning.[11] The Conference Report on the Act, for example, states:

> Subsection (b)(1)(B) requires that any other eligibility criteria shall remain the same as the 1984 regulations *except for alterations specifically made in the statute.*

H.Rep. 1173, 100th Cong., 1st Sess. 1173 (1987) (emphasis added). This statement confirms what a plain reading of the statute discloses: that the 1984 regulations were to stay in place except for those changes—and *only* those changes—specifically identified by Congress. In addition, the report of the Senate Appropriations Committee discusses Section 618 at some length. *See* S.Rep. 160, 100th Cong., 1st Sess. 142–44 (1987). Noting the controversies that have beset the CFC in the last several years, the Committee pointed out that, in the preamble to interim regulations published in May 1987, OPM had identified a number of reforms that it believed would improve the conduct of the annual Campaigns but which it was unable to implement due to legislation requiring OPM to repromulgate its 1984 regulations. The

Committee therefore added Section 618 in order to

> expedite the process by breaking the logjam and allowing the reforms identified by OPM to be specifically dealt with in revised CFC regulations for the 1988 CFC.

*Id.* at 143. The Report went on to observe that

> [T]he Committee identifies the reforms that OPM would be allowed to implement in new regulations. For the most part, the reforms are those that were identified by OPM in its preamble to the interim regulations.

*Id.* Significantly, neither the language of Section 618 adopted by the Committee nor the preamble to OPM's interim regulations mentions dual listing.[12] The legislative history therefore reveals the Congressional intent to implement several discrete changes in Section 618 and to leave the 1984 regulations otherwise intact, thus reaffirming the plain words used in the statute.

Finally, OPM maintains that its ban on dual listing "flows inexorably" from the national/local distinction in Section 618, Opposition at 6, and argues that, under *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), its reading of the statute is entitled to deference from this Court. That position, however, is not accurate, for the question of statutory interpretation presented in this case is not of the sort that would warrant *Chevron*-type deference to OPM's view. This is not a case where a broad statutory grant was left for agency interpretation, *see Webster v. Doe,* —— U.S. ——, ——, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988)

---

**11.** Section 618 was not discussed in the House Report, *see* H.Rep. No. 415, 100th Cong., 1st Sess. (1987), in the debates on passage of H.J. Res. 395, *see* 133 Cong.Rec. H10900–83 (daily ed. Dec. 3, 1987); *id.* S17791–963 (Dec. 11, 1987); *id.* H11992–12046 and S18712–60 (Dec. 21, 1987), or by the President when he signed the Act into law, *see* 23 Weekly Comp.Pres.Doc. 1546–47 (Dec. 22, 1987).

**12.** Only one of the reforms outlined by OPM in the preamble to the 1987 interim regulations relates to eligibility. OPM stated that, if free to do so, it would

rationalize 'local presence' rules that annually result in the expenditure of hundreds of thousands of dollars by national charities that must cobble together a patchwork of indices of community involvement despite their pursuit of a national mission holding out benefits to all Americans.

52 Fed.Reg. 16,174, 16,174 (1987). This reform—which Congress later authorized in Section 618—does not discuss, explicitly or implicitly, dual listing of national organizations and related local affiliates.

(statute allowing CIA Director to terminate employee when he deems it "necessary or advisable" to United States' interests "fairly exudes deference" to the agency); nor a case where a single word is susceptible of two plausible meanings, *EEOC v. Commercial Office Products Co.*, — U.S. ——, 108 S.Ct. 1666, 1671, 100 L.Ed.2d 96, (1988) (deference given to agency interpretation of the word "terminate"); nor a case where an agency is interpreting a statute of scientific and technological complexity, *see Chemical Manufacturers Association v. NRDC*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (variances from toxic pollutant effluent limitations in the Clean Water Act). Rather, this is a situation where Congress sought to rectify chronic problems that had arisen in the CFC by enumerating detailed and particular criteria to cabin OPM's discretion. In such a situation, the traditional measure of deference is inapplicable, *see Vanguard Interstate Tours, Inc. v. ICC*, 735 F.2d 591, 596 (D.C.Cir.1984); *NARUC v. FCC*, 533 F.2d 601, 618 (D.C.Cir.1976), and a court must rely on traditional canons of statutory construction to determine the legislature's intent. *Vanguard*, 735 F.2d at 596–97. Having employed those methods, it is clear what Congress intended. Although there may be interstices in Section 618, Congress directed how those gaps should be filled—by reference to the 1984 regulations. Congress said that the 1984 regulations were to remain in effect "except as otherwise provided." It did *not* say "except as otherwise provided *and except* when OPM finds that a requirement is inherent in this Section." [13] To permit OPM to implement its dual listing prohibition would contravene the earlier regulations and would concomitantly undermine current Congressional intent set forth in Section 618(b)(1)(B). This the Court will not do.

To reiterate. The dual listing regulations promulgated by OPM are inconsistent with Section 618 of the Act. Because Congress' intent is clear from the face of the

statute, its purposes and legislative history, there is no ambiguity warranting resort to the extrinsic materials offered by OPM to divine Congressional intent. But even were one to assume that the terms of Section 618 are somehow unclear (and they are not), these extrinsic materials do not lead to acceptance of defendant's proposition: that the dual listing provision is consistent with Section 618.

OPM claims that, in the negotiations leading to enactment of Section 618, "[i]nterested members of Congress and their staffs, longtime CFC participants, and OPM representatives were virtually unanimous in their opposition to dual listing." Opposition at 13. The documents submitted do not support this assertion. For example, OPM relies on an August 7, 1987 letter from four members of Congress setting forth "basic principles" that should guide future Campaigns. *See* Exhibit D to Declaration of Hugh Hewitt (Hewitt Dec.). Although the letter does discuss a distinction between national and local eligibility, it nowhere mentions a ban on dual listing and, like Section 618, it makes clear that the 1984 regulations were to remain in effect. *Id.* And the absence of any mention of dual listing does not, as OPM suggests, demonstrate that it was "assumed" that dual listing was incompatible with a national/local distinction. To the contrary. Given the "well-settled presumption that Congress understands the state of existing law when it legislates," *Bowen v. Massachusetts*, — U.S. ——, ——, 108 S.Ct. 2722, 2733, 101 L.Ed.2d 749 (1988), the fact that the letter from these legislators (as well as the legislative history itself) did not refer to dual listing may be adequately explained by this Court's decision in *PPMW I*. As noted above, that ruling determined that a dual listing prohibition violated a Congressional statute requiring OPM to promulgate regulations that were consistent with the 1984 regulations—which did *not* contain a dual listing ban. Congress did not mention dual listing in Section 618.

**13.** If OPM is dissatisfied with Section 618, it is, of course, entirely free to return to Congress to seek new legislation.

It is a far leap—too far and simply illogical —to assume that a dual listing ban is permissible because Congress did not legislatively address the matter.

OPM has also proffered affidavits from agency officials and from individuals who participated in negotiations prior to the enactment of Section 618. It is abundantly clear, however, that any "attempt at the creation of legislative history through the *post-hoc* statements of interested onlookers is entitled to *no weight.*" *Western Air Lines, Inc. v. Board of Equalization of South Dakota,* 480 U.S. 123, 107 S.Ct. 1038, 1043 n. \*\*, 94 L.Ed.2d 112 (1987) (emphasis added). These materials—submitted *after* the passage of Section 618 from individuals with a clear interest in the outcome of this litigation—are not appropriate measures of the meaning of the statute.

Defendant also points to a statement made by Richard Leary during hearings held by OPM's CFC Task Force in September 1987. Mr. Leary was testifying as Executive Director of the International Service Agencies, a group of organizations of which PPFA is a member. In response to a hypothetical question about dual listing, he stated:

> It should be just the one listing. Pearl Buck, as an illustration, is a national organization, and to my knowledge, *they would not have operating chapters that would be separate from their national organization.* So, in our case, we would certainly endorse one listing for an agency.

Hewitt Dec., Exhibit K, Volume 1 at 60 (emphasis added). This remark, however, does not prove that a ban on dual listing was accepted as a necessary component of the national/local dichotomy. For one thing, the highlighted language shows that Mr. Leary contemplated a situation with an *integrated* organization, one quite different from the relationship between PPFA and PPMW (both of which are separately incorporated). Moreover, the rest of the CFC Task Force hearings undercuts OPM's assertion that a dual listing ban was essential to the functioning of its new system of eligibility. The Court has read the entire transcript of the hearings. It appears (and the parties have not suggested otherwise) that, in approximately 1500 pages of testimony, OPM officials did not ask another question about dual listing. By way of comparison, almost *every* witness was queried about problems such as undesignated contributions, write-in contributions and the functions of PCFOs.[14] And while the local presence requirement was raised numerous times, no witness offered comments on the matter of dual listing. *See, e.g., id.* Vol. I at 17–18, 196–97, 391–92; *id.* Vol. II at 25–27, 97–98; *id.* Vol. III at 14–16, 33–35. In short, although OPM and others express present concern about the alleged pernicious effects of dual listing, this same concern was not directly communicated during the CFC Task Force Hearings.

In a general argument, OPM further maintains that Section 618 resulted from a long process of delicate negotiations that sought to accommodate the interests of all CFC participants and that plaintiffs are now seeking to derail that careful bargain through this lawsuit. While Section 618 was in fact the product of a compromise— thoroughly, vigorously and delicately bargained, that alone is no reason to deny plaintiffs a forum for their claims. *All* legislation results from compromise; that is its very essence. Taken to its extreme, OPM's argument would preclude any challenges to statutes passed by Congress. That position, of course, is unacceptable.[15]

For these reasons, the Court finds that OPM's extrinsic evidence does not alter the

---

**14.** *See, e.g., id.* Vol. I at 19–22, Vol. II. at 20–23, Vol. III at 12–12 (undesignated contributions); *id.* Vol. I at 18–19, Vol. II at 23–25, Vol. III at 34–35 (write-ins); *id.* Vol. I at 16–17, Vol. II at 27–28, Vol. III at 18–21 (PCFOs).

**15.** Moreover, OPM's contention that invalidating the dual listing ban would upset the "grand compromise" of Section 618 is undermined by its actions promulgating the most recent regulations. As plaintiffs note, *see* Reply Brief at 7 n. 3, OPM significantly altered its proposed dual listing ban to accommodate the objections of a number of groups that commented on the proposed rule.

conclusion reached by employing usual methods of statutory construction: that the dual listing prohibition is inconsistent with Section 618 because it is not specifically provided for in the statute. Frustrated in its earlier effort to ban dual listing explicitly, *see PPMW I,* OPM now seeks to find ambiguity in Section 618 and then interpret that "ambiguity" with after-the-fact rationalization about Congressional intent. Neither of those arguments has merit. Accordingly, it is clear that plaintiffs have a substantial likelihood of prevailing on the merits of their claim.

### B. Irreparable Injury

■ If preliminary injunctive relief is denied, plaintiffs will suffer serious injury. Able to enforce its dual listing proscription, OPM will exclude PPMW and other PPFA affiliates from participation in this year's campaign. Direct financial harm would occur. In the 1987 Campaign, for example, PPMW received $190,000 in contributions, a figure representing approximately 20% of its private donations. *See* Affidavit of Rosann Wisman, submitted with Plaintiffs' Motion for a Preliminary Injunction, ¶¶ 3–4.[16] Because the CFC is the sole means by which federal workers can be solicited while on the job, the lost monies are irreplaceable. Moreover, these private funds are used to subsidize medical and educational services that PPMW renders to the poor, services that PPMW would be forced to curtail if removed from the Campaign. Implementation of the dual listing rule would therefore adversely affect the Planned Parenthood affiliates and the individuals that they serve.

OPM does not deny the self-evident fact that exclusion form the Campaign will deprive PPMW and other affiliates from receiving a substantial amount of money in federal contributions. Rather, it asserts that PPFA and its affiliates "are part of a hydra-headed organization in which money flows freely back and forth among its constituent parts." Opposition at 15. This lack of financial independence, defendant maintains, will allow PPFA to reimburse its affiliates for any losses that might result from the dual listing ban. Although plaintiffs dispute this characterization of their financial affairs, it is, in any event, irrelevant. Even if the funds of PPFA and its affiliates *were* readily transferred to one another, exclusion of the affiliates would reduce the overall amount of money available for distribution within the Planned Parenthood "network." If PPFA shouldered this burden, financial harm would still ensue—only this time it would be PPFA, and not its affiliates, that would be harmed. While the loss cannot be determined in absolute terms, there is no doubt that immediate and irretrievable loss *would* occur absent preliminary injunctive relief.

### C. Harm to Others

■ OPM envisions a variety of harms that will result if injunctive relief is granted. It first contends that plaintiffs are seeking "an unfair advantage" in this litigation. Pointing out that plaintiffs are the only CFC participants to challenge the dual listing regulation and that the deadline for applications to the CFC has now passed, defendant asserts that plaintiffs will be the sole beneficiaries of a ruling barring use of the dual listing provision. If listed twice in Campaign brochures, PPFA and its affiliates will, according to defendant, receive more money and exposure than organizations listed just once.

The Court must take a different view. The dual listing ban was first proposed as a regulation in February 1988 and then became effective on May 26, 1988. Every other CFC participant similarly-impacted had an equal opportunity to challenge that provision or any other aspect of OPM's regulations. Plaintiffs should not be penalized for resorting to the judicial process to vindicate its rights, and even less so because of the failure of others to do the same. Moreover, after this litigation was instituted, any of the organizations that might benefit from a favorable ruling could

---

**16.** The other PPFA affiliates that participate in the CFC would experience a similar monetary strain. *See* Declaration Jack Bode, Attachment 1 to Reply Brief, ¶¶ 12–16.

have moved to intervene in this action, but none has opted to do so.[17] Finally, the Court would agree with the common-sense proposition that listing PPFA and its affiliates in the same CFC brochure would most likely increase the amount of money that they would otherwise receive.[18] That does not mean, however, that this increase would come at the expense of other CFC participants. Although PPFA and PPMW have taken part in the CFC in each of the last three years, defendant has failed to present *any* evidence or suggest *any* data that would show a harm to other Campaign organizations in those years. This lack of evidence is reflected in the affidavits of Campaign participants submitted by OPM. Although criticizing plaintiffs' desire to dual list as "unfair" and "greedy," none has specified the manner in which they would be harmed. *See, e.g.,* Affidavit of James W. Krueger (American Red Cross) ¶ 9 ("In the event that the plaintiffs are successful, the American Red Cross, as well as its chapters, would be injured"); Affidavit of David F. Weeks (Research to Prevent Blindness, Inc.) ¶ 5 ("If the Plaintiffs and other agencies are allowed dual CFC listings, RPB would suffer serious financial loss); Affidavit of Robert S. Bolan (American Diabetes Association) ¶ 3 (organization would be injured "if dual solicitation for Planned Parenthood were permitted since our agencies would be listed only once"). No affiant has attempted to estimate the amount of money that it contends would be diverted to PPFA and its affiliates should dual listing be permitted. Nor has any affiant stated why its longtime donors would suddenly decide to withhold contributions and instead direct them to a Planned Parenthood organization. These vague and unsubstantiated assertions cannot, and do not, lead to the conclusion that plaintiffs' participation in the CFC would cause these groups financial harm.

OPM also argues that dual listing of PPFA and PPMW (or other affiliates) would harm the Campaign itself. This is so, defendant alleges, because listing one organization twice when others are listed just once would create an impression of favoritism that would "sow confusion and division" among federal workers and CFC participants. Opposition at 20. If OPM is correct, then surely the Campaign is already hopelessly beset with confusion and division. A perusal of the 1988 brochure for the National Capital Area CFC, *see* Exhibit A to Reply Brief, reveals, *inter alia,* three entries for Boys and Girls Clubs, four slots for various Jewish organizations, and eight listings for chapters of the American Red Cross. It is difficult to imagine that inclusion of PPFA and PPMW in the Campaign could further muddle the thinking of (what OPM's argument would lead one to believe is) an already-perplexed federal worker.

### D. The Public Interest

This lawsuit amply illustrates Justice Holmes' aphorism that "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). Of course, OPM is correct when it asserts that "a strong, effective and harmonious CFC in which all parties play on a level field is in the public interest." Opposition at 20. In passing Section 618, however, Congress sought to level that playing field and close many of the "old wounds and controversies" that have plagued the CFC throughout the years. *Id.* Those scars were not reopened when plaintiffs filed this lawsuit, but rather when OPM promulgated its ban on dual listing. An injunction against its enforcement would allow the healing process to begin once again and, hopefully, make the Campaign whole and true for the

---

**17.** OPM also maintains that many organizations that take part in the CFC are either unable to list twice (because of their organizational structure) or have chosen not to do so; it argues that these groups would be harmed by plaintiffs' dual listing. Of course, neither plaintiffs nor this Court can control how these firms conduct their affairs, and any harms resulting from their

*own* business decisions are the consequences of those choices.

**18.** This assertion by defendant undermines its previous argument that plaintiffs would not be injured if the dual listing regulation went into effect.

well-being of its recipients *and* its contributors.

### III. Conclusion

 Plaintiffs have successfully carried their burden of showing that they are entitled to the relief that they seek. Each of the four factors discussed above favors entry of a preliminary injunction barring defendant from enforcing its regulations that proscribe dual listing: plaintiffs have a substantial likelihood of prevailing on the merits; immediate and irreparable injury would result in the absence of this relief; no other party will be damaged by the entry of an injunction; and the public interest in a fair and equitable CFC will be realized. Accordingly, preliminary injunctive relief is warranted and shall be granted.

A separate Order accompanies this Memorandum Opinion.

### APPENDIX TO MEMORANDUM OPINION

*Planned Parenthood v. Horner,*
No. 88–1751

SEC. 618. (a) None of the funds appropriated by this Act, or any other Act in this or any fiscal year hereafter, may be used in preparing, promulgating, or implementing any regulations relating to the Combined Federal Campaign if such regulations are not in conformance with subsection (b).

(b)(1)(A) Any requirements for eligibility to receive contributions through the Combined Federal Campaign shall not, to the extent that such requirements relate to litigation, public-policy advocacy, or attempting to influence legislation, be any more restrictive than any requirements established with respect to those subject matters under section 501(c)(3) or 501(h) of the Internal Revenue Code of 1986.

(B) Any requirements for eligibility to receive contributions through the Combined Federal Campaign shall, to the extent that such requirements relate to any subject matter other than one referred to in subparagraph (A), remain the same as the criteria in the 1984 regulations, except as otherwise provided in this section.

(C) Notwithstanding any requirement referred to in subparagraph (A) or (B), for purposes of any Combined Federal Campaign—

(i) any voluntary agency or federated group which was a named plaintiff as of September 1, 1987, in a case brought in the United States District Court for the District of Columbia, and designated as Civil Action No. 83–0928 or 86–1367, and

(ii) The Federal Employee Education and Assistance Fund,

shall be considered to have national eligibility.

(D) Public accountability standards shall remain similar to the standards which were by regulation established with respect to the 1984–1987 Combined Federal Campaigns, except that the Office of Personnel Management shall prescribe regulations under which a voluntary agency or federated group which does not exceed a certain size (as established under such regulations) may submit a copy of an appropriate Federal tax return, rather than complying with any independent auditing requirements which would otherwise apply.

(2)(A) A voluntary agency or federated group shall, for purposes of any Combined Federal Campaign in any year, be considered to have national eligibility if such agency or group—

(i) complies with all requirements for eligibility to receive contributions through the Combined Federal Campaign, without regard to any requirements relating to "local presence"; and

(ii) demonstrates that it provided services, benefits, or assistance, or otherwise conducted program activities, in—

(I) 15 or more different States over the 3–year period immediately preceding the start of the year involved; or

(II) several foreign countries or several parts of a foreign country.

For purposes of this subparagraph, an agency or federated group shall be considered to have conducted program activities in the required number of States, countries, or parts of a country, over the period

of years involved, if such agency or group conducted program activities in such number of States, countries, or parts either in any single year during such period or in the aggregate over the course of such period, provided that no State, country, or part of a country is counted more than once.

(B) Notwithstanding any other provisions, eligibility requirements relating to International Services Agencies shall remain at least as inclusive as existing requirements. Any voluntary agency or federated group which attains national eligibility under subparagraph (A), and any voluntary agency which is a member of the International Services Agencies, shall be considered to have satisfied any requirements relating to "local presence".

(3)(A) If a federated group is eligible to receive donations in a Combined Federal Campaign, whether on a national level (pursuant to certification by the Office) or a local level (pursuant to certification by the local Federal coordinating committee), each voluntary agency which is a member of such group may, upon certification by the federated group, be considered eligible to participate on such national or local level, as the case may be.

(B) Notwithstanding any provision of subparagraph (A)—

(i) the Office may require a voluntary agency to provide information to support any certification submitted by a federated group with respect to such agency under subparagraph (A); and

(ii) if a determination is made, in writing after notice and opportunity to submit written comments, that the information submitted by the voluntary agency does not satisfy the applicable eligibility requirements, such agency may be barred from participating in the Combined Federal Campaign on a national or local level, as the case may be, for a period not to exceed 1 campaign year.

(4) The Office shall exercise oversight responsibility to ensure that—

(A) regulations are uniformly and equitably implemented in all local combined Federal campaigns;

(B) federated groups participating in a local combined Federal campaign are allowed to compete fairly for the role of principal combined fund organization;

(C) federated groups participating in a local combined Federal campaign are afforded—

(i) adequate opportunity to consult with the PCFO for the area involved before any plans are made final relating to the design or conduct of such campaign (including plans pertaining to any materials to be printed as part of the campaign);

(ii) adequate opportunity to participate in campaign events and other related activities; and

(iii) timely access to all reports, budgets, audits, and other records in the possession of, or under the control of, the PCFO for the areas involved; and

(D) a federated group or voluntary agency found by the Office, by a written decision issued after notice and opportunity to submit written comments, to have violated the regulations may be barred from serving as a PCFO for not to exceed 1 campaign year.

(5) The Office shall prescribe regulations to ensure that PCFOs do not make inappropriate delegations of decisionmaking authority.

(6)(A) The Office shall, in consultation with federated groups, establish a formula under which any undesignated contributions received in a local combined Federal campaign shall be allocated in any year.

(B) Under the formula for the 1990 Combined Federal Campaign, all undesignated contributions received in a local campaign shall be allocated as follows:

(i) 82 percent shall be allocated to the United Way.

(ii) 7 percent shall be allocated to the International Services Agencies.

(iii) 7 percent shall be allocated to the National Voluntary Health Agencies.

(iv) 4 percent shall, after fair and careful consideration of all eligible federated groups and agencies, be allocated by the local Federal coordinating committee among any or all of the following:

(I) National federated groups (other than any identified in clauses (i), (ii), or (iii)), except that a national federated group shall not be eligible under this subclause unless there are at least 15 members of such group participating in the local campaign, unless the members of such group collectively receive at least 4 percent of the designated contributions in the local campaign, and unless such group was granted national eligibility status for the 1987, 1988, 1989, or 1990 Combined Federal Campaign.

(II) Local federated groups.

(III) Any local, non-affiliated voluntary agency which receives at least 4 percent of the designated contributions in the local campaign.

(C) The formula set forth in subparagraph (B)—

(i) shall be phased in over the course of the 1988 and 1989 Combined Federal Campaigns;

(ii) shall be fully implemented with respect to the 1990 Combined Federal Campaigns; and

(iii) shall, with respect to any Combined Federal Campaign thereafter, be adjusted based on the experience gained in the Combined Federal Campaigns referred to in clauses (i) and (ii).

(D) Nothing in this paragraph shall apply with respect to any campaign conducted in a foreign country.

(E) All appropriate steps shall be taken to encourage donors to make designated contributions.

(7) The option for a donor to write in the name of a voluntary agency or federated group not listed in the campaign brochure to receive that individual's contribution in a local campaign shall be eliminated.

(8) The name of any individual making a designated contribution in a campaign shall, upon request of the recipient voluntary agency or federated group, be released to such agency or group, unless the contributor indicates that his or her name is not to be released. Under no circumstance may the names of contributors be sold or otherwise released by such agency or group.

(9)(A) The name of each participating voluntary agency and federated group, together with a brief description of their respective programs, shall be published in any information leaflet distributed to employees in a local combined Federal campaign. Agencies shall be arranged by federated group, with combined Federal campaign organization code numbers corresponding to each such agency and group.

[27] (B) The requirement under subparagraph (A) relating to the inclusion of program descriptions may, at the discretion of a local Federal coordinating committee, be waived for a local campaign in any year if, in the immediately preceding campaign year, contributions received through the local campaign totalled less than $100,000.

(10) Employee coercion is not to be tolerated in the Combined Federal Campaign, and protections against employee coercion shall be strengthened and clarified.

(11) The Office—

(A) may not, after the date of the enactment of this Act, grant national eligibility status to any federated group unless such group has at least 15 member voluntary agencies, each of which meets the requirements for national eligibility under paragraph (2)(A); and

(B) may withdraw federation status from any federated group for a period of not to exceed 1 campaign year if it is determined, on the record after opportunity for a hearing, that the federated group has not complied with the regulatory requirements.

(12) The Office may bar from participation in the Combined Federal Campaign, for a period not to exceed 1 campaign year, any voluntary agency which the Office determines, in writing, and after notice and opportunity to submit written comments, did not comply with a reasonable request by the Office to furnish it with information relating to such agency's campaign accounting and auditing practices.

(c) For purposes of this section, a voluntary agency or federated group having "na-

tional eligibility" is one which is eligible to participate in each local domestic combined Federal campaign.

### ORDER

For the reasons set forth in the Memorandum Opinion issued this date, it is

ORDERED that plaintiffs' motion for a preliminary injunction be and it hereby is granted; it is

FURTHER ORDERED that the defendant, Constance Horner, Director, United States Office of Personnel Management, and her agents, including all the Local Federal Coordinating Committees for the National Capital Area Combined Federal Campaign and for all other local Combined Federal Campaigns, be and they hereby are enjoined from enforcing or applying the "dual listing" provisions of 5 C.F.R. §§ 950.201(c), .204(e) and .402(b), or otherwise taking into account the national eligibility status of plaintiff Planned Parenthood Federation of America, Inc., in considering the applications to local Campaigns made by any Planned Parenthood organization.

Defendant Constance Horner shall promptly provide notice of this Order to all Federal Coordinating Committees by such means as will assure receipt of such notice no later than 12:00 noon, July 22, 1988, in the relevant time zone, and shall promptly certify to the Court and to opposing counsel when this has been accomplished; it is

FURTHER ORDERED that plaintiffs shall post with the Clerk of the Court a bond totalling $1,000 in cash or surety no later than 12:00 noon, July 22, 1988, failing which this preliminary injunction shall stand immediately dissolved; it is

FURTHER ORDERED that, in consideration of the pressing deadlines governing the administration of the Campaign which have necessitated this Court's prompt resolution of plaintiffs' motion for a preliminary injunction, there shall be no stay of this Order in the event that defendant notes an appeal; and it is

FURTHER ORDERED that the parties shall submit a written statement to the Court no later than August 1, 1988, indicating whether and how each intends to proceed with the remainder of this action.

Counsel for the parties have been telephonically notified of the contents of this Order.